IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| JARVIS HARRIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:12-cv-02668-STA-dkv |
| | ) | |
| GRADY PERRY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER TO MODIFY THE DOCKET,
DISMISSING CLAIMS 1-3,
REFERRING MATTER TO MAGISTRATE JUDGE
FOR POSSIBLE APPOINTMENT OF COUNSEL
AND
DIRECTING PETITIONER TO FILE AN *IN FORMA PAUPERIS* AFFIDAVIT**

Before the Court is the Petition Under 28 U.S.C.A. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition") filed by Petitioner, Jarvis Harris, Tennessee Department of Correction prisoner number 400198, an inmate at the Hardeman County Correctional Facility ("HCCF") in Whiteville, Tennessee. (§ 2254 Pet., *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1.)[1] For the reasons stated below, the Court DISMISSES Claims 1 through 3 and refers the matter to the Magistrate Judge for consideration of the appointment of counsel.

---

[1] The Clerk is directed to modify the docket to reflect the correct spelling of Petitioner's first name.

# I.       BACKGROUND

## A.       State Court Procedural History

On January 28, 2003, a grand jury in Shelby County, Tennessee, returned two indictments against Harris, Thaddeus Johnson, and Maurice Thomas.   Case Number 03-00441 charged Johnson, Thomas, and Harris with the first degree murder of Montreal [sic] Graham.   (Indictment, *State v. Harris,* No. 03-00441 (Shelby County Crim. Ct.), ECF No. 15-1 at PageID 100-01.)[2] Case Number 03-00442 charged Johnson, Thomas, and Harris with the attempted first degree murder of Maurice Wooten.   (Indictment, *State v. Harris,* No. 03-00442 (Shelby Cnty. Crim. Ct.), ECF No. 15-1 at PageID 102-03.)

At some point, Harris' attorney filed a motion to suppress his statements.   (Mot. to Suppress Def.'s Statement, *State v. Harris,* Nos. 03-00441, -00442 (Shelby Cnty. Crim. Ct.), ECF No. 15-1 at PageID 132-33.)

A jury trial on the charges against Harris commenced in the Shelby County Criminal Court on December 12, 2005.   After jury selection, the trial judge held a hearing on the motion to suppress and, at the conclusion of the hearing, denied the motion.   (Trial Tr. 97-101, *id.*, ECF No. 15-4.)   On December 15, 2005, the jury returned guilty verdicts on both indictments.   (Trial Tr. 449-50, *id.*, ECF No. 15-6.)   On or about February 12, 2006, the State filed a motion seeking consecutive sentencing and a notice of enhancement factors.   (Mot. for Consecutive Sentencing, *id.*, ECF No. 15-1 at PageID 171-72; Not. of Enhancement Factors, *id.*, ECF No. 15-1 at PageID 173-76.)   At a sentencing hearing on February 23, 2006, the trial judge sentenced Harris to concurrent terms of life imprisonment with the possibility of parole on the first degree murder and

---

[2] The trial transcript spells the victim's first name as "Montreal."

eighteen years on the attempted first degree murder.   (Sentencing Hr'g Tr. 39, *id.*, ECF No. 15-7.)

Judgments were entered on May 25, 2006.   (J., *State v. Harris,* No. 03-00441 (Shelby Cnty. Crim.

Ct.), ECF No. 15-1 at PageID 177; J., *State v. Harris,* No. 03-00442 (Shelby Cnty. Crim. Ct.), ECF

No. 15-1 at PageID 178.)   The Tennessee Court of Criminal Appeals ("TCCA") affirmed the

convictions but remanded the case for Harris to be resentenced on the attempted murder.   *State v.*

*Harris*, No. W2006-02234-CCA-R3-CD, 2007 WL 2409676 (Tenn. Crim. App. Aug. 24, 2007),

*appeal denied* (Tenn. Jan. 28, 2008).[3]

On or about January 8, 2009, Harris filed a *pro se* petition in the Shelby County Criminal

Court pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101

to -122.   (Pet. for Post-Conviction Relief, *Harris v. State*, No. 03-00441 (Shelby County Crim.

Ct.), ECF No. 15-15 at PageID 930-37; *see also* Post-Conviction for Relief, *id.*, ECF No. 15-15 at

PageID 943-77.)   Harris filed a *pro se* amendment to his post-conviction petition on January 27,

2009.   (Am. Post-Conviction for Relief, *id.*, ECF No. 15-15 at PageID 978-1065.)   The State

responded to the petition on February 27, 2009.   (Resp. to Pet. for Post-Conviction Relief, *id.*,

ECF No. 15-15 at PageID 1066.)   Various attorneys were appointed to represent Harris.   (Order

Appointing Private Counsel to Represent Def., *id.*, ECF No. 15-15 at PageID 1067; Order

Allowing Attorney of Record to Withdraw as Counsel for Pet'r, *id.*, ECF No. 15-15 at PageID

1068; Order Appointing Private Counsel to Represent Pet'r, *id.*, ECF No. 15-15 at PageID 1069;

Order Appointing Private Counsel to Represent Def., *id.*, ECF No. 15-15 at PageID 1070.)

Hearings on the post-conviction petition were held on May 20, 2010, and June 29, 2010.

---

[3] On remand, an amended judgment was entered in Case Number 03-00442 on September 17, 2006, that reduced Harris' sentence for the attempted murder to fifteen years.   (Am. J., *State v. Harris,* No. 03-00442 (Shelby Cnty. Crim. Ct.), ECF No. 23-1 at PageID 1301.)

(05/20/2010 Post-Conviction Hr'g Tr., *id.*, ECF No. 15-16; 06/29/2010 Post-Conviction Hr'g Tr., *id.*, ECF No. 15-17.) The post-conviction court denied relief on August 9, 2010. (Order Denying Pet. for Post-Conviction Relief, *id.*, ECF No. 15-15 at PageID 1072-79.) The TCCA affirmed. *Harris v. State,* No. W2010-01848-CCA-R3-PC, 2011 WL 3629230 (Tenn. Crim. App. Aug. 18, 2011), *appeal denied* (Tenn. Dec. 13, 2011).

The TCCA summarized the evidence introduced at the suppression hearing, at trial, and at the sentencing hearing:

### Suppression Hearing

Lieutenant Anthony Craig of the Memphis Police Department testified that he was the case coordinator for the investigation of the April 11, 2002, murder of Montrell Graham. Through his investigation, he learned that the defendant's vehicle had been seen in the area of the shooting five minutes prior to the murder. Following the defendant's arrest, Lieutenant Craig and Sergeant Fitzpatrick took a statement from the defendant on April 14, 2002. Lieutenant Craig advised the defendant of his rights, and the defendant signed an advice of rights form at 6:13 p.m. The defendant's interview began at approximately 10:00 p.m. and ended at 12:25 a.m. the following morning, at which time the defendant signed his statement. Lieutenant Craig said that the defendant's interview was not recorded or videotaped. He stated that the defendant knew he was being held on a homicide charge, was cooperative during the interview, and never asked for a lawyer or to talk to his family. The defendant initially denied any involvement in the murder, saying that he had taken his girlfriend to a doctor's appointment at the time of the shooting. However, the defendant later admitted that he was in the area of the shooting with "Little E."[4] The defendant also told Lieutenant Craig about an altercation that occurred during a dice game on April 5, 2002, in which Maurice Wooten was accused of having stolen some marijuana. The defendant told Lieutenant Craig that, as a result, a contract with the Vice Lords was made on Wooten's life.

After interviewing Eric Cooper and Maurice Wooten, Lieutenant Craig interviewed the defendant again on April 16, 2002, because Cooper had given him additional information regarding the defendant's participation. The defendant was again advised of his rights and then gave another statement in which he explained his involvement in the murder:

---

[4] At trial, Eric Cooper testified that his nickname was "Little E."

Thursday evening I was in the Oakshire Apartments, me and some partners and Lil E. Rell[5] was calling my phone several times to come pick him up and to go get his check....

I took Rell out to the Olive Garden to get his check. While he was in there getting his check, me and Lil E was still in the car.... So I left the Olive Garden and took him to Fastcheck on Winchester near Perkins.... So I was intending to drop him back off back home but he wanted to go kick it with me, smoke some weed. He said come on let's go to the hood and get some weed but we never did find no weed.

So I pulled up in the cut in the Oakshire and saw Maurice and Trail, Melvin sitting on the green box. I tried to reverse back out and then Rell said go back in so everybody could see he was with me so I could be his alibi. So I pulled back out and go to the next cut on the left of the building. So then we get out, we just chilling right now.... So Rell asked to use my phone, he was calling Bookie first. He had called Bookie and asked Bookie for a 9mm. Bookie had told him yes, it's at the house. So then Rell had got on the phone with Maurice and asked where he's at and all that and he said he was at the Mall.

So he kept on rushing Maurice to come on to the hood saying it's time, several times. Rell said it's "21 bricks execution," it's time, this was Traveling Vice-Lord stuff. Then Rell said "it's got to be done, it's got to be done, it's a hit. I can't let it go no longer, it's got to be done tonight." So after that Rell tried to call Bookie again, he called him about four or five times but Bookie didn't answer.... We had left the back apartments in the Oakshire, then we had went to the front of the apartments where the big loop at and then Rell was saying just drop me off over Maurice's house.

But before I could drop him off at Maurice's house, Maurice was in the front of the apartments already. So we go to the front but on the backside of the front and park. Me, Maurice and Rell talking, he saying he need some "black stuff." So, me, Maurice and Lil E went to Maurice's house to get some ski masks, some gloves[,] some shoes and some black jogging pants, black ski mask and a gold ski mask. So by the time we get around the apartments in front, I'm thinking I'm fixing to get ready to drop Maurice off. So Rell jumped and grabbed one of my phones, then I had said "what you doing with that phone?" I say "give me my phone back," he said he was going to use this phone to get in touch with me. So after

_____
[5] At trial, Eric Cooper testified that codefendant Thaddeus Johnson was known as "Rell."

5

they changed their clothes, Maurice had already changed at the house, he had on black. Rell changed clothes, putting his orange shoes and orange shirt in my back seat of my car.   Then he gave me his money and stuff....

And Maurice['s] cell phone and Chicago bulls cap, leather, it was on my back seat.  So then me, Lil E and Lil B[6] jumped in my car.  Rell and Maurice was walking off towards the field.  I told Rell not to lose my phone; it would lead back to me.  So after I dropped B off, me, Lil E rides around the Whitehaven View Apartments.  So I'm thinking the shooting fixing to go on but it didn't.   So Rell called me on my phone telling me he don't see him or nothing.  So he told me to come back to the apartments, now we on the last cut on the right.

I pulled up and see them standing out; they got their all black on and two caps on, so I pulled up in the cut and g[o]t out....   That's when I said I want that "bright bitch twin dead" because he walked up behind me when I walking off like he wanted to shoot me in my back and stuff.   So now I'm leaving back out and Rell called me and said pull up in the cut to see where they at.   So I pulled up in the cut, he said tell me where they at.   So I said they tuck back in the cut, all the way in the cut.   I said both of them is.

By then I pulled out the cut, so I stopped by Citgo to get me something to drink.   I went back to the Whitehaven View Apartments now. Me and Lil E parked, I told Lil E to sit right here in my car and told him to lock my doors.   After that I jumped back in the car, I pulled around to the other side of the Whitehaven View because Rell suppose to had come over there after the shooting.   I pulled to the other side that's when I heard nine shots; it sounded like nine shots because of the echo in the apartments.   I'm riding back real fast over the speed bumps.   So Rell called me on the phone running through the field talking about pick me up behind Granny's Market.

I pulled out the apartments, me and Lil E and the light was red so I shot through Citgo way through Freezeway.   They was behind Granny's already waiting on me.   So instead of me going behind Granny's cut, I just pulled up right behind Joey's cut; it's like a poolhall bar.   So then they jump in behind Joey's so nobody wouldn't see them getting in my car.   So Rell talking about let's go get some weed and stuff.   I dropped Maurice off at the house.   Maurice said his gun was missing, it wasn't shooting.   Rell had said "I shot that bitch, that bitch dropped, I shot him some more."   So I said which one you have shot?   So he said the bright twin, the one I wanted

---

[6] The defendant later identified "B" as Brandon, a member of the Traveling Vice Lords.

dead....  Bookie called me, I told Rell be quiet so Bookie wouldn't hear him.  Bookie had said, "you know Trail dead mane," so I said for real, what happen[ed]?  Then Bookie asked where Rell at, I said he ain't with me though.  So I hung up and then I said to Rell "you shot the one with the freckle face with the gold teeth," and I was real mad.  And we was cussing each other out.  I was saying to Rell you shot the wrong person, you shot an innocent person, has never done nothing ... to nobody.  So I came back and said had you even shot the bright twin and then that's when he came on and told the truth, he said naw.  Rell was saying fuck that shit.  So by the time we left Joey's, I dropped Maurice right off, he asked if he could borrow $10.00.

Nobody had no change at the time so I dropped him off.  We pulled out his driveway going on to the Shelby Inn.  So Rell was talking about we need to get a room to smoke some weed....  We're still cussing and arguing each other out.  So he changed clothes in the room.  I said "mane you shot the wrong one, you fucked off the mission."  So he telling me fuck that shit ... he changing clothes.

Rell say I got to burn these clothes shoes everything.  So we left out the room, they went out to the back where my car was parked and I went to the front.  So I walked back to the back and Rell had his clothes in a plastic bag, I opened my trunk to get some power steering fluid and he had put it on the clothes.  He had burnt the clothes slowly, then we just sat there for about five minutes.  I told E make sure nobody ain't coming while the clothes were burning.

We get back in the car and pull out and took Rell home.  We was still arguing, he said "fuck that shit, I don't want to hear no more about it, the shit done now."  So I take him home.

Lieutenant Craig said the defendant made several corrections to his second statement and initialed each page.

Lieutenant Craig acknowledged that he knew Officer Eddie Bass but denied that Bass was present during the defendant's interview.  He said that Officer Bass was a uniformed patrol officer at the time and would not have had access to homicide cases because officers from other departments are not allowed to speak to a suspect unless approval is obtained from a supervisor.  He testified that Sergeant Reginald Morgan was related to the defendant and was removed from the case as a result.  He denied that Morgan was present during the defendant's interviews and said there was no way Bass or Morgan could have talked to the defendant without his knowledge because, as the case coordinator, he was given notification of

anyone desiring to speak to the defendant. He said the defendant was offered food and drink and an opportunity to use the restroom.

The defendant testified that he was a high school graduate and could read and write. He said that he was arrested at about 3:45 p.m. on April 14, 2002, and taken to the homicide office where he was handcuffed to a chair for six to eight hours. He said Lieutenant Craig and Sergeant Fitzpatrick showed him a photograph of Montrell Graham and read him his rights. He said he asked for a lawyer four or five times but later signed a waiver of rights form saying he did not want a lawyer. After about two hours, his cousin, Eddie Bass, Jr., a detective with the Memphis Police Department, came to see him while he was still in the large area room of the homicide office. He told Bass, who was dressed in plain clothes, that he wanted an attorney, but Bass told him that he did not need one and that he should tell the officers everything he knew and not go to the penitentiary for someone else. The defendant said that Bass and Reginald Morgan later told him they were "going to work everything out." He denied that the officers ever gave him any food or drink or allowed him to use the restroom. He said that after sitting handcuffed in a chair for about six hours, he was moved to another room where his statement was typed by a transcriptionist. He acknowledged that his statement reflected what he had said that night and that he initialed and signed it, explaining that he did so because Bass "came in and undermined [him]." He said the officers never asked him if he belonged to a gang.

The defendant admitted that he "left something out" in his first statement. He said that he was incarcerated between April 14 and April 16 and was taken to the homicide office again around 7:00 a.m. on April 16. He was interviewed by Lieutenant Craig and another officer for six or seven hours. He said that he asked for an attorney but was not asked to sign a waiver of rights form at the time of his second statement. However, he admitted that he knew he had a right to a lawyer when he read the first waiver. He acknowledged that he made corrections to his second statement, as well as initialed each page and signed it.

At the conclusion of the hearing, the trial court found that the defendant had given both of his statements freely and voluntarily and denied the motion to suppress.

## Trial

Lucille Nevels testified that Montrell Graham was her nephew and that he was twenty-two years old when he was killed. Ms. Nevels explained that she was testifying as the family representative because Graham's mother died thirteen days after he did.

Eric Cooper testified that his nickname was "Little E" and that he had known the defendant for about two years. He said that the defendant, Thaddeus Johnson, and Maurice Thomas were members of the Vice Lords. He said he was riding around with the defendant smoking marijuana on April 11, 2002, when Johnson, also known as "Rell," called the defendant. The defendant picked up Johnson at his house, and the three men then picked up and cashed Johnson's paycheck before going to the Oakshire Apartments to buy more marijuana. When they arrived at the apartments, the defendant told Johnson that Maurice Wooten was "still out there." They then drove around to the front of the apartments where the defendant and Johnson got out of the car and talked to Maurice Thomas while Cooper remained in the car. The defendant, Cooper, Johnson, and Thomas then went to Thomas' house where Thomas retrieved some dark-colored clothing.

Cooper testified that the four men returned to the Oakshire Apartments, and Johnson and Thomas changed into the dark clothes. The defendant gave Johnson one of his cell phones and told Johnson to call him when he was "through." Cooper and the defendant then went to another apartment complex down the street "to post up," or "sit and wait." A short time later, Cooper heard gunshots and the defendant then received a phone call from Johnson. The defendant and Cooper drove to Granny's Market across the street from the Oakshire Apartments. Johnson and Thomas came up to the defendant's car, and Johnson said, "I shot that Bitch." The defendant drove Thomas to his mother's house, and Cooper, Johnson, and the defendant went to a hotel on Shelby Drive where the defendant told Johnson that he shot the wrong person.[7] Johnson changed his clothes and burned the dark clothing behind the hotel.

Cooper testified that he subsequently gave a statement to the police and identified the defendant from a photographic lineup. He said he did not know that the defendant had a problem with Maurice Wooten until after the shooting when the defendant told him that he had a problem with Wooten. Cooper acknowledged that he did not hear the defendant tell anyone to do anything.

Maurice Wooten testified that Montrell Graham was his best friend and that he had known the defendant since elementary school. He said the defendant and other members of the Vice Lords accused him of stealing some marijuana at a dice game on April 5, 2002, six days before the murder of Graham. Wooten said that on April 11, 2002, he, Graham, Melvin Stuckey, and Antonio Taylor were socializing "in the cut"[8] of the Oakshire Apartments when the defendant, Thaddeus Johnson, and one or two other men drove up in the defendant's gray Crown

_____

[7] According to Cooper, Maurice Wooten was the intended victim.

[8] From photographs of the apartment complex admitted into evidence, "the cut" appears to be an opening between two apartment buildings with a chain-link fence separating the complex from a school.

Victoria automobile. He described what happened next: "And all of a sudden they pulled out the cut and rolled off. Ten minutes later there went a gunshot. We heard shots. And me and my Bo, Bo, me, Melvin and Antonio, we running for our lives." Wooten said one of the men chased and shot at him and Stuckey, and he heard another gun being fired nearby. He said he ran to his mother's house, and he and his brother later returned to the Oakshire Apartments and saw the police and an ambulance. Wooten said he also saw the defendant at the apartments after the shooting. Wooten explained that he knew the defendant was a member of the Vice Lords because the defendant "was steadily telling [him] and throwing ... signs up." He said the defendant previously had tried to recruit his brother in the Vice Lords.

Officer Frankie Muhammad of the Memphis Police Department testified that he responded to the scene of the crime where he found the victim lying on the ground between two apartment buildings by a green utility box. He said the victim had a bullet wound to his head and was pronounced dead on arrival by emergency medical personnel.

Sergeant Shan Tracy of the Memphis Police Department testified that he responded to the crime scene which was near Oakshire Elementary School. He described the location of the crime as "kind of a walkway or a grassy area between two ... apartment buildings. And then to the north there was a fence and a gate in the fence where you could go to the school." Sergeant Tracy and another officer prepared a sketch of the crime scene, which was admitted into evidence. Blood was found on the green electrical transformer box, and a spent bullet was recovered from the victim's broken cell phone found in his pants pocket. Sergeant Tracy said the victim appeared to have several gunshot wounds.

Sergeant Danny James of the Memphis Police Department testified that on April 16, 2002, he responded to a call about some burnt clothing at the Shelby Inn on Shelby Drive. He took photographs of the burnt clothing and collected some of it as evidence.

Lieutenant Anthony Craig reiterated much of his testimony from the suppression hearing. He said that when he interviewed the defendant on April 14, 2002, the defendant initially denied that he was at the scene of the shooting and said that he had taken his girlfriend to a doctor's appointment. However, when Lieutenant Craig contacted the defendant's girlfriend, she denied that the defendant was with her that day. Lieutenant Craig said the defendant did not appear to be under the influence of alcohol or drugs. After talking to Eric Cooper on April 15, 2002, Lieutenant Craig again interviewed the defendant on April 16, 2002. He said that the defendant's statement was reduced to writing, and the defendant initialed each page and corrected several typographical errors throughout the statement before signing it. At the request of the State, Lieutenant Craig read the

defendant's statements to the jury.   Both statements were marked as exhibits and admitted into evidence.

On cross-examination, Lieutenant Craig testified that, according to the arrest ticket, the defendant was arrested at 3:40 p.m. on April 14, 2002.   When the defendant arrived at the homicide office, he was placed in an interview room.   He said that the defendant's initial oral statement, in which he denied any involvement in the homicide, was not reduced to writing and that the defendant gave the oral statement before he executed the advice of rights form at 6:13 p.m.

Clara Benson testified that in 2002 she was a transcriptionist for the Memphis Police Department Homicide Bureau.   She identified the defendant's April 16, 2002, statement as one she had typed and said she typed only what the defendant said.   She said she worked with Lieutenant Craig, Sergeant Fitzpatrick, and other officers, and the officers always treated suspects "very nice" and furnished them food if they were hungry.

Dr. Teresa Campbell, a forensic pathologist, testified that she performed an autopsy on the victim on April 12, 2002, and determined the cause of death to be multiple gunshot wounds.   She said that the defendant had a gunshot wound to the left temporal area, which penetrated the brain, and one to the back upper part of the right thigh, which struck the femur bone and lacerated a branch of the femoral artery.   The bullets from both wounds were recovered and collected as evidence.

The defendant did not present any proof.

### Sentencing Hearing

The defendant's mother, Carolyn Harris, testified at the February 23, 2006, sentencing hearing that the defendant was twenty-four years old and that she and the defendant's father had been married for twenty-two years.   She said that the defendant had grown up in Memphis, completed high school, and been employed at UPS and as a part-time lifeguard at the local YMCA.   She stated that the defendant had been in a major fight in high school, which had resulted in his transfer to a different school, but other than that had never caused her any problems.   On cross-examination, she denied any knowledge of the defendant's membership in a gang.

*State v. Harris,* 2007 WL 2409676, at *1-7.

**B.  Procedural History of Harris' § 2254 Petition**

On July 30, 2012, Harris filed his *pro se* § 2254 Petition, accompanied by a legal memorandum.  (§ 2254 Pet., *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1; Mem. of Law in Supp. of § 2254 Pet., *id.*, ECF No. 1-1.)  Harris paid the habeas filing fee on July 31, 2012.  (Case initiation fee, *id.*, ECF No. 2.)  The Court issued an order on August 27, 2012, directing Respondent, HCCF Warden Joe Easterling, to file the state-court record and a response to the § 2254 Petition.  (Order, *id.,* ECF No. 3.)[9]  That order inadvertently neglected to direct the Clerk to serve the § 2254 Petition and the August 27, 2012, order on Respondent.  On November 16, 2012, the Court directed the Clerk to serve Respondent and extended Respondent's time to respond.  (Order, *id.*, ECF No. 5.)

On January 9, 2013, Respondent filed a motion to dismiss the § 2254 Petition as time barred.  (Mot. to Dismiss, *id.*, ECF No. 14.)  Respondent also filed most of the state-court record at that time.  (Resp't's Not. of Filing, *id.*, ECF No. 15.)  Harris filed a response in opposition to the motion to dismiss on March 18, 2013.  (Pet'r's Resp. to Resp't's Mot. to Dismiss, *id.*, ECF No. 19.)  On April 10, 2013, Respondent filed a motion seeking leave to withdraw his motion to dismiss.  (Resp't's Mot. for Leave to Withdraw His Mot. to Dismiss, *id.*, ECF No. 21.)  In an order issued on April 26, 2013, the Court granted leave to withdraw the motion to dismiss and ordered Respondent to file the remainder of the state-court record and a response to the § 2254 Petition.  (Order, *id.*, ECF No. 22.)

On June 10, 2013, Respondent filed the remainder of the state-court record and his Answer to the Petitioner's § 2254 Petition ("Answer").  (Resp't's Suppl. Not. of Filing, *id.*, ECF No. 23;

_____

[9]  The Clerk is directed to substitute current HCCF Warden Grady Perry for Joe Easterling as respondent.  *See* Fed. R. Civ. P. 25(d).

Answer, *id.*, ECF No. 24.)   On July 2, 2013, Harris filed his Reply to Respondent's Answer to Petition ("Reply").   (Reply, *id.*, ECF No. 25.)

## II.          PETITIONER'S FEDERAL HABEAS CLAIMS

In his § 2254 Petition, Harris raises the following issues:

1.      "Whether the trial court erred by its denial of petitioner's pretrial motion to suppress the evidence?" (§ 2254 Pet. at PageID 5, *id.*, ECF No. 1; *see also* Mem. of Law in Supp. of § 2254 Pet. at 4-7, *id.*, ECF No. 1-1);

2.      "Whether prosecution's references to petitioner as a gang member and other related gang inferences they-so [sic] prejudice the jury as to deny petitioner a fair trial?" (§ 2254 Pet. at PageID 7, *id.*, ECF No. 1; *see also* Mem. of Law in Supp. of § 2254 Pet. at 8-10, *id.*, ECF No. 1-1);

3.      "Whether the trial court erred in not suppressing petitioner's April 16, 2002 confession" (§ 2254 Pet. at PageID 8, *id.*, ECF No. 1); and

4.      "Whether the petitioner was denied of [sic] effective assistance of counsel during the subsequent trial and appellate proceedings against him?" (*id.* at PageID 10; *see also* Mem. of Law in Supp. of § 2254 Pet. at 11-17, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1-1).

## III.          THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   A federal court may grant habeas relief to a state prisoner "only

on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).

## A.      Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).   The petitioner must "fairly present"[10] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except when the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999).   Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies."   *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement.   *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and

---

[10]   For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam).   Nor is it enough to make a general appeal to a broad constitutional guarantee.   *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 732; *see Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion requirement).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 322 (1995); *Coleman*, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

**B.    Merits Review**

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Id.* at 1398 (internal quotation marks and citations omitted).[11]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[12] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 412-13. The state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines

---

[11] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[12] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[13]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court adjudication will not be

---

[13] In *Wood*, 558 U.S. at 293, 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. *Id.* at 300-01, 304-05. In *Rice*, 546 U.S. at 339, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

## IV.     ANALYSIS OF PETITIONER'S CLAIMS

### A.     The Motion to Suppress (Claims 1 and 3)

In Claims 1 and 3, Harris argues that the trial court erred when it denied his motion to suppress. (§ 2254 Pet. at PageID 5 & 9, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1.)    Harris explains that, "[b]ased on the testimony of Lieutenant Anthony Craig during the petitioner's Motion to Suppression Hearing, he testified during cross-examination that 'when the petitioner was taken in to custody that he was not taken into custody as a suspect but as witness.'" (*Id.* at PageID 5; *see also id.* at PageID 9 (same).)

Harris challenged the trial court's denial of the motion to suppress on direct appeal. (Br. of Appellant at 4, 12-13, *State v. Harris,* No. W2006-02234-CCA-F3-CD (Tenn. Crim. App.), ECF No. 15-10.)    The TCCA denied that claim on the merits, reasoning as follows:

> The defendant next contends that the trial court erred in denying his motion to suppress his statements to the police, arguing, among other things, that "his confession was the product of an illegal promise by Eddie Bass [and] Sergeant Morgan to 'work everything out.'['']    When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).    Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).    Thus, the findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *See id.*    However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. *See State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. *See* U.S. Const. Amend. V; Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily made after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'["] *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884, 68 L. Ed. 2d 378 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938)).

In denying the defendant's motion to suppress, the trial court found that the defendant's statements were freely and voluntarily made and were not the product of coercion or promises:

> [T]he Court finds that both statements were freely and voluntarily given by this defendant. That no coercion ... was brought upon this defendant, no threats or promises. The defendant did not indicate that there were any threats or promises made to him. Maybe he may have said a promise was made that they were going to try to take care of him or something to that effect, and his cousin said something, I'll try to help you if you tell the truth. Something to that effect. But I have no indication that a cousin talked to him. I have indication from the officer that he hadn't seen this cousin that's supposed to have been in there and—not while he was there. The officer, Lieutenant Craig, indicated that patrol officers are not allowed to come in and start talking to people that they have for homicides unless it goes through the coordinating officer. And he said he had no knowledge of that.

> The Court['s] of the opinion that ... these statements were freely and voluntarily given and can be admitted into evidence at this time and will overrule your Motion to Suppress these statements.

The record supports the trial court's findings. The defendant asserts that his cousin coerced him into making the statement by his implied promise that the officers would "work everything out" if the defendant told them what he knew of the crime. However, Lieutenant Craig's testimony, which was accredited by the trial court, established that the defendant's cousin was not present during the interviews and could not have gained access to the defendant without Lieutenant Craig's permission. Lieutenant Craig also testified that the defendant was advised of his rights before giving each statement and that he signed the advice of rights

form and initialed and signed the statements. The defendant himself testified that he was a high school graduate, could read and write, and had signed the advice of rights form and the statements. He further acknowledged that he knew he could have had a lawyer present during questioning if he had desired one. In sum, the evidence supports the trial court's finding that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. Accordingly, we conclude that the trial court did not err in denying the defendant's motion to suppress his statements.

*State v. Harris,* 2007 WL 2409676, at *9-10.

In his post-conviction petition, Harris argued that his "[c]onviction was based on use of coerced confession by police misconduct" and that his "[c]onviction was based on use of evidence gained pursuant to an unconstitutional unreasonable search and seizure." (Pet. for Post-Conviction Relief at PageID 934, *Harris v. State,* No. 03-00441 (Shelby Cnty. Crim. Ct.), ECF No. 15-15.) In an attachment to the petition, Harris argued that the police lacked probable cause to arrest him (*id.* at PageID 946-47) and that he was handcuffed during his hours in the interrogation room (*id.* at PageID 949). Harris also claimed that his cousin, Officer Eddie Bass, encouraged him to cooperate. (*Id.* at PageID 946, 949.) The TCCA held that those issues were either waived or previously determined:

> We agree with the post-conviction court and the State that issues relative to the trial court's denial of the petitioner's motion to suppress have been previously determined. *See* T.C.A. § 40–30–106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence."). The petitioner filed an unsuccessful motion to suppress his statements to police, and the trial court's denial of that motion later served as an issue on direct appeal. On direct appeal, this court held that "the evidence supports the trial court's finding that the defendant knowingly, intelligently, and voluntarily waived" his constitutional rights prior to giving the statements to police. *See Jarvis Harris*, slip op. at 12. Any other claim that the petitioner's statements should have been suppressed, including the petitioner's assertion at the evidentiary hearing that the statements were the product of an illegal arrest, would qualify as waived for failure

20

to present them at trial and on appeal. *See* T.C.A. § 40–30–106(g) ( "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.").

*Harris v. State,* 2011 WL 3629230, at *3.

In his Answer, Respondent argues that Claims 1 and 3 are not cognizable in a § 2254 Petition. (Answer at 21, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 24.) Fourth Amendment issues are not cognizable in § 2254 petitions when the prisoner had a full and fair opportunity to litigate the issue in state court. *Stone v. Powell,* 428 U.S. 465, 494 (1976). Here, Harris had a full and fair opportunity to litigate a Fourth Amendment claim, having been granted a suppression hearing and the opportunity to raise the issue on direct appeal. Therefore, Claims 1 and 3 are not cognizable in this § 2254 Petition.

Claims 1 and 3 are without merit and are DISMISSED.

**B.      The Prosecutor's Allegedly Improper References to Harris' Gang Affiliation (Claim 2)**

In Claim 2, Harris argues that the "prosecution's references to [him] as a gang member and other related gang inferences they-so [sic] prejudice the jury as to deny [him] a fair trial." (§ 2254 Pet. at PageID 7, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1.) According to Harris,

> [t]he State made comments in relation to the petitioner as being a gang member throughout petitioner's trial despite the fact that no testimonial evidence was ever presented by law enforcement in the petitioner's [trial] that the petitioner had been previously arrested for other gang related crimes or recognized as a gang member by Memphis Police Gang Task Force.

(*Id.*; *see also* Mem. of Law in Supp. of § 2254 Pet. at 8 (same), *id.*, ECF No. 1-1.)   Harris also argued that the prosecutor committed misconduct by referring to him as a gang member.   (Mem. of Law in Supp. of § 2254 Pet. at 9-10, *id.*, ECF No. 1-1.)

Harris raised this issue on direct appeal.   (Br. of Appellant at 4, 5-11, *State v. Harris,* No. W2006-02234-CCA-R3-CD (Tenn. Crim. App.), ECF No. 15-10.)   The TCCA denied relief on the merits, reasoning as follows:

### A.       Denial of Motion in Limine

The defendant contends that the trial court erred in denying his motion in limine to exclude references to gang affiliation, arguing that such references "unduly excited the emotions and prejudice of the jury to deny [the defendant] a fair and impartial trial."   The State argues that the gang references were relevant to show the motive and intent behind the shooting and were not offered to prove that the defendant was a gang member or to show that he acted in conformity with the character trait of a gang member.

This court has previously concluded that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)."   *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001).   Rule 404(b) of the Tennessee Rules of Evidence provides as follows:

(b) Other Crimes, Wrongs, or Acts.   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person or to show action in conformity with the character trait.   It may, however, be admissible for other purposes.   The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

While evidence of a prior crime, wrong, or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, intent, motive, opportunity, or absence of mistake or accident. *See State v. Shropshire*, 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). When the trial court has substantially complied with the requirements of Rule 404(b), this court reviews its decision to admit or exclude evidence under an abuse of discretion standard. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In a pretrial hearing, defense counsel argued that the trial court should exclude any reference to gangs or gang affiliation because the "mere mention of the words Vice Lords, Gangster Disciples, whatever, Crips, Bloods, is so overly prejudicial as ... to overcome the relevancy that it might have." Defense counsel asserted that the defendant never admitted that he was a gang member and that any testimony identifying him as such was hearsay. In overruling the defendant's motion to exclude the evidence, the trial court found that the defendant's statement that the motive for the shooting was a Vice Lords hit was relevant evidence and that defense counsel was free to cross-examine the witnesses about any references to the defendant's gang affiliation. Implicit in the trial court's ruling was the additional finding that the probative value of the evidence outweighed the danger of unfair prejudice to the defendant.

We find no abuse of discretion in the trial court's ruling in this matter. The references to gang affiliation and the fact that the murder resulted from a gang "hit" were relevant to show the motive and intent for the shooting. Furthermore, in our view, the probative value of the evidence outweighed the danger of unfair prejudice.

### B.    Improper Comments by Prosecutor

The defendant additionally argues that it was plain error for the prosecutor to mention his gang affiliation during opening and closing statements. During both opening and closing statements, the prosecutor referred to the portion of the defendant's statement in which he said that the shooting was a Vice Lords "hit," in support of his argument that the murder was premeditated. Defense counsel, in turn, argued in closing that the defendant, although present, had no prior knowledge that his companions were planning to shoot anyone. In response, the prosecutor made the following remarks during rebuttal:

I'll tell you one thing that's not simple about this case. And that is that on April 11th, 2002, Montrell Graham was executed. That's not simple. And what else is not simple is Vice Lord justice. Because on April 11th, 2002 [the defendant], Maurice Thomas, and Thaddeus Johnson, planned, prepared for and attempted to execute, had a get-away, and a cover-up, to kill Maurice Wooten.

The State argues that the prosecutor's comments were supported by the evidence at trial and, thus, were not improper. We agree with the State. Counsel for both the State and the defense have traditionally been permitted wide latitude in arguing their cases to the jury and trial judges afforded wide discretion in their control of those arguments. *See State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998); *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). Nonetheless, a party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999).

The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

We find nothing improper about the prosecutor's comments in this case. The prosecutor was merely relying on the defendant's statement, which was admitted into evidence, in advancing his argument that the shooting was a premeditated act in which the defendant had participated. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

*State v. Harris,* 2007 WL 2409676, at *7-9.

Claim 2 is not cognizable in a federal habeas petition insofar as it argues that the evidence was admitted in violation of the Tennessee Rules of Evidence and Tennessee law because there was no proof that Harris was a member of a gang. A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254(a). Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Therefore, Claim 2 is not cognizable in a § 2254 proceeding insofar as it seeks relief for an alleged violation of Tennessee law.

In *Berger v. United States,* 295 U.S. 78 (1935), the Supreme Court reversed a defendant's criminal conviction because the prosecutor had engaged in misconduct, namely,

> [h]e was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.

*Id.* at 84. In addition, "[t]he prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions, calculated to mislead the jury." *Id.* at 86. The Supreme Court concluded that the remedy for the prosecutor's misconduct was to reverse the defendant's conviction and remand the case for a new trial:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. The court below said that the case against Berger was not strong; and from a careful examination of the record we agree. Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were the other defendants, we think may properly be characterized as weak—depending, as it did, upon the testimony of Katz, an accomplice with a long criminal record.

In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. . . .

*Id.* at 88-89 (citations omitted).

*Berger* was a direct appeal. In *Donnelly v. DeChristoforo,* 416 U.S. 637, 639 (1974), the Supreme Court held that the standard for evaluating a claim of prosecutorial misconduct during closing argument was "whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate [the prisoner's] right to due process." In so holding, the Supreme Court noted that the proper standard of review in a habeas case is "the narrow one of due process, and not the broad exercise of supervisory power that [a court of appeals] would possess in regard to (its) own trial court." *Id.* at 642 (internal quotation marks omitted). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Id.* (internal quotation marks omitted). In finding that the petitioner had not shown a violation of his due process rights, the Supreme Court emphasized that "[c]onflicting inferences have been drawn from

the prosecutor's statement by the courts below," *id.* at 643, and that "the trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence in the case," *id.* at 644. The Supreme Court also noted that "the prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions." *Id.* at 645. Thus, the Supreme Court concluded that, "[a]lthough the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process." *Id.*

The next case in which the Supreme Court addressed a claim of prosecutorial misconduct during closing arguments was *Darden v. Wainwright,* 477 U.S. 168 (1986). According to the Supreme Court, the State's closing argument

> deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair. Several comments attempted to place some of the blame for the crime on the Division of Corrections, because Darden was on weekend furlough from a prison sentence when the crime occurred. Some comments implied that the death penalty would be the only guarantee against a future similar act. Others incorporated the defense's use of the word "animal." Prosecutor McDaniel made several offensive comments reflecting an emotional reaction to the case. These comments undoubtedly were improper. But as both the District Court and the original panel of the Court of Appeals (whose opinion on this issue still stands) recognized, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d, at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642, 94 S. Ct., at 1871.

*Id.* at 179-81 (footnotes omitted).

The Supreme Court carefully reviewed the prosecutors' remarks in context, along with the record as a whole, and concluded that "we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial." *Id.* at 181. Because of a local procedural peculiarity, the defense presented the initial summation and a rebuttal to the State's closing arguments. The Supreme Court emphasized that

> [t]he prosecutors' comments must be evaluated in light of the defense argument that preceded it, which blamed the Polk County Sheriff's Office for a lack of evidence, alluded to the death penalty, characterized the perpetrator of the crime as an "animal," and contained counsel's personal opinion of the strength of the State's evidence.

*Id.* at 179 (footnotes omitted). "The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. Much of the objectionable content was invited by or was responsive to the opening summation of the defense." *Id.* at 181-82 (citation omitted). Any danger presented by the prosecutors' comments was neutralized by the trial judge's instructions. *Id.* at 182. The defense made an effective rebuttal, "turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner." *Id.* Finally, "[t]he weight of the evidence against petitioner was heavy . . . , reduc[ing] the likelihood that the jury's decision was influenced by argument." *Id.*

In *Parker v. Matthews,* 132 S. Ct. 2148 (2012), its most recent decision addressing a claim of prosecutorial misconduct during closing argument, the Supreme Court held that the Sixth Circuit had erred in granting the writ on the basis, *inter alia,* that the prosecution's closing argument amounted to a violation of due process. The Supreme Court reiterated that "[t]he

'clearly established Federal law' is our decision in *Darden v. Wainwright . . . .*" *Id.* at 2153. The Supreme Court concluded that the Sixth Circuit had taken the prosecutor's objectionable statements out of context, making the conclusion that there had been a violation of due process "unsupportable." *Id.* at 2154. Even if the prosecutor's comments could properly be understood

> as directing the jury's attention to inappropriate considerations, that would not establish that the Kentucky Supreme Court's rejection of the *Darden* prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S., at ——, 131 S. Ct., at 786–787. Indeed, *Darden* itself held that a closing argument considerably more inflammatory than the one at issue here did not warrant habeas relief. *See* 477 U.S., at 180, n.11, 106 S. Ct. 2464 (prosecutor referred to the defendant as an "'animal' "); *id.*, at 180, n.12, 106 S. Ct. 2464 ("'I wish I could see [the defendant] with no face, blown away by a shotgun'"). Particularly because the *Darden* standard is a very general one, leaving courts "more leeway ... in reaching outcomes in case-by-case determinations," (*Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004)), the Sixth Circuit had no warrant to set aside the Kentucky Supreme Court's conclusion.

*Id.* at 2155.

Finally, the Supreme Court noted that "[t]he Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the Kentucky Supreme Court's decision." *Id.*

> [C]ircuit precedent does not constitute "clearly established Federal law, as determined by the Supreme court," 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under the AEDPA. Nor can the Sixth Circuit's reliance on its own precedents be defended in this case on the ground that they merely reflect what has been "clearly established" by our cases. The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.

*Id.*

The § 2254 Petition and the Answer offer scant assistance in analyzing the prosecutorial misconduct claim. In his filings, Harris has not specified whether he contends that the decision of the TCCA on the issue was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). In his Answer, Respondent argues that Harris is not entitled to relief on his prosecutorial misconduct claim "because the state court's dismissal of the claim was not contrary to, or an unreasonable application of, clearly held federal law and was based on a reasonable determination of the facts." (Answer at 23, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 24.) Although the Answer was filed a year after the Supreme Court's decision in *Parker,* the Answer applies the two-part test developed by the Sixth Circuit that had been disapproved in *Parker.* (*See id.* at 25.)

The TCCA's decision was not contrary to, or an unreasonable application of, the Supreme Court's decisions in *Donnelly* and *Darden* and was not based on an objectively unreasonable factual determination. During closing arguments, the prosecutor emphasized that there was no dispute about the essential facts of the case and that the only job for the jury was to determine whether Harris was completely uninvolved, a facilitator or a member of the conspiracy to commit first degree murder. (Trial Tr. 412-13, *State v. Harris,* Nos. 03-00441, -00442 (Shelby Cnty. Crim. Ct.), ECF No. 15-6.) The prosecutor listed fifteen items of evidence that, he argued, "put Jarvis Harris in that third boat with these killers as a man who is criminally responsible for this first degree murder." (*Id.* at 413.) The prosecutor's argument with respect to Item 15 forms the basis for Harris' prosecutorial misconduct claim. The prosecutor argued: "Number 15, and it

underlies all of them, when he describes what's really going on here. This is a 21 bricks execution. This is a Vice Lord execution. That's what this is all about. Can you get more premeditated? Can you get more planned?" (*Id.* at 417.) In rebuttal, the prosecutor stated,

> I'll tell you one thing that's not simple about this case. And that is that on April 11th, 2002 Montrell Graham was executed. That's not simple. And what else is not simple is Vice Lord justice. Because on April 11th, 2002 Jarvis Harris, Maurice Thomas, and Thaddeus Johnson, planned, prepared for and attempted to execute, had a get-away, and a cover-up, to kill Maurice Wooten.

(*Id.* at 436.) Later, the prosecutor made two more scattered references to "Vice Lord justice." (*Id.* at 445 ("a group of Vice Lords got together and decided they have their on [sic] laws. They have their own punishment. They have their own system of justice. And Maurice Wooten stole from them. So they're going to carry out their sentence."), 446 ("Maurice Wooten has got people chasing him, bullets flying by, whizzing by. Can you imagine that. Hitting apartment buildings where families are. That's Vice Lords justice. It does not matter who's around when they decide something is going to happen. It happens. And I ask you, ladies and gentlemen, I ask you, you, to make a decision just like the Vice Lords did on April 11, 2002. You make a decision and apply the right kind of justice.").)

The TCCA's conclusion that the references to the Vice Lords were supported by the evidence at trial, *State v. Harris,* 2007 WL 2409676, is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. at 103. Eric Cooper testified that Harris had told him that he, Thaddeus Johnson, and Maurice Thomas were members of the Vice Lords. (Trial Tr. 153, *State v. Harris,* Nos. 03-00441, -00442 (Shelby Cnty. Crim. Ct.), ECF No. 15-5.) Maurice Wooten testified that he knew Harris was a member of the Vice Lords because

"[h]e was steadily telling me and throwing it up, throwing signs up." (*Id.* at 212; *see also id.* at 213 (by his gestures, Harris "was telling you what he is and he a member of this and that").) Wooten had previously had an altercation with Harris because Harris was trying to recruit Wooten's brother to join the Vice Lords. (*Id.* at 213.) On cross-examination, Wooten testified that he was not a member of the Vice Lords and did not know what the sign was. (*Id.* at 223.) He knew Harris was a Vice Lord because, in addition to making gang signs, he had told Wooten that he was a member "all the time." (*Id.* at 224.) On redirect examination, Wooten testified that Rell was a Vice Lord. (*Id.* at 225.) At the dice game, the people who were accusing Wooten of stealing marijuana were members of the Vice Lords. (*Id.* at 225-26.) On recross-examination, Wooten testified that he was not affiliated with a gang. (*Id.* at 226.)

Memphis Police Department Lieutenant Anthony Craig testified that Harris gave a statement to the police on April 16, 2002, in which he claimed that "Rell said it's 21 brick execution. It's time. This was Travelling Vice Lord stuff. Then Rell said it's got to be done. It's got to be done. It's a hit. I can't let it go no longer. It's got to be done tonight." (Trial Tr. 319, *State v. Harris,* Nos. 03-00441, -00442 (Shelby Cnty. Crim. Ct.), ECF No. 15-6.) In his statement, Harris related that B, who had provided one of the guns used in the shooting, was "[o]ne of the Travelling Vice Lords." (*Id.* at 325.) Craig testified that Harris had told him that the phrase "21 bricks execution" was "Travelling Vice Lords stuff." (*Id.* at 328; *see also id.* at 326-28 (same).)

The TCCA concluded that the prosecutor's references to the "Vice Lords" in his closing arguments were supported by the evidence introduced at trial and were, therefore, not improper.

*State v. Harris,* 2007 WL 2409676, at *9. That conclusion is not based on an objectively unreasonable factual determination.[14]

Harris also has not satisfied his burden of establishing that the TCCA's decision was contrary to, or an unreasonable application of, *Donnelly* and *Darden.* Although the TCCA did not cite the controlling Supreme Court decisions and did not explicitly refer to the highly generalized standard established in *Donnelly* and *Darden*, it did cite a decision that applied *Darden.* *See State v. Cauthern,* 967 S.W.2d 726, 737 (Tenn. 1998). It was unnecessary for the TCCA to address the effect of the prosecutor's remarks on the jury because it concluded that the remarks were supported by the evidence introduced at trial and were, therefore, not improper. An examination of those remarks, in light of the evidence introduced at trial, establishes that they are far less inflammatory than those found not to have rendered the prisoners' trials fundamentally unfair in *Donnelly*, *Darden* and *Parker.*

Claim 2 is without merit and is DISMISSED.

---

[14] Several of Harris' arguments are not properly considered. Harris argues that the prosecutor's statements were improper because no evidence was presented at trial that he had previously been arrested for other gang-related crimes or recognized as a gang member by the Memphis Police Department's Gang Task Force. (§ 2254 Pet. at PageID 7, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1.) That argument, which was not presented to the state courts, is legally irrelevant. A habeas court is supposed to review the evidence introduced at trial, *Cullen,* 131 S. Ct. at 1398, and is not to speculate about whether other, more probative evidence might have been introduced. Proof that Harris had previously been accused of being, or had been identified as, a gang member probably would not have been admissible at trial. *See* Tenn. R. Evid. 403.

In his legal memorandum, Harris argues that he was taken by surprise by the gang references, which hindered him from being able to present a defense. (Mem. in Supp. of § 2254 Pet. at 10, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1-1.) That argument, which was not presented to the state courts, is not persuasive. Defense counsel had sufficient reason to believe that Harris' gang affiliation might be mentioned at trial that he filed a motion *in limine* to exclude it. (*See* Mot. In Limine Regarding Admissibility of Gang Affiliation, *State v. Harris,* No. 03-00441, -00442 (Shelby Cnty. Crim. Ct.), ECF No. 15-9.)

### C. Ineffective Assistance of Counsel (Claim 4)

In Claim 4, Harris argues that his trial and appellate counsel rendered ineffective assistance, in violation of the Sixth Amendment. (§ 2254 Pet. at PageID 10, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 1.) In the form § 2254 Petition, Harris alleges only that "Petitioner's trial counsel failed to investigate the petitioner's case in relation to the law both factually and legally." (*Id.*) In his legal memorandum, Harris argues that his trial counsel (i) failed to mention during the argument on the motion to suppress that Harris had been arrested without probable cause "because the petitioner was arrested and taken into custody without an arrest warrant in relation to the victim's death" (Mem. in Supp. of § 2254 Pet. at 12, *id.¸* ECF No. 1-1); (ii) failed to mention during the argument on the motion to suppress that "the officers' [sic] continu[ed] to question [him] after he invoked his right to have counsel present during the custodial interrogation on both April 14, 2002 and on April 16, 2002" (*id.* at 13); (iii) failed to raise in the motion for a new trial that the trial court erred in denying the motion to suppress on the grounds that (a) "the petitioner was handcuffed the entire time, although, he was treated as a witness, not as a suspect, during the interview" and (b) the police continued to question him after he had invoked his right to counsel (*id.* at 14); and (iv) "fail[ed] to adequately prepare petitioner for trial and to adequately communicate with the petitioner prior to the petitioner trial, because petitioner's trial counsel failed to confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain what potential defenses were or were not unavailable" (*id.*). Harris further alleges that his appellate counsel rendered ineffective assistance by failing to raise on appeal the Fourth Amendment issues that trial counsel had neglected to include in the motion for a new trial. (*Id.* at 17.)

In his Answer, Respondent argues that the portion of Claim 4 addressing the performance of trial counsel is barred by procedural default. (Answer at 22-23, *Harris v. Perry,* No. 2:12-cv-02668-STA-dkv (W.D. Tenn.), ECF No. 24.) Respondent also argues that the TCCA's resolution of the ineffective assistance of appellate counsel claim was not contrary to, or an unreasonable application of, clearly established federal law. (*Id.* at 27-28.)

Harris has potentially viable ineffective assistance of trial counsel and ineffective assistance of appellate counsel claims that have not been squarely addressed by the state courts. Throughout the state-court proceedings, Harris consistently argued that he was arrested in violation of the Fourth Amendment. At the post-conviction hearing, "the petitioner maintained that trial counsel was ineffective because he failed to properly articulate the Fourth Amendment issue to the trial court." *Harris v. State,* 2011 WL 3629230, at *2. "The petitioner also asserted that his appellate counsel failed to challenge on appeal his illegal arrest. Essentially, the petitioner claimed that his statements to police should have been suppressed because he was arrested without probable cause prior to giving the statements." *Id.*[15]

The Fourth Amendment issue arises from the testimony of Lieutenant Craig at the suppression hearing about how Harris was developed as a suspect. Craig testified that,

> [b]asically after the incident we canvassed the area for any type of witness statements. A—something that stuck out was a vehicle that was owned by the individual or the defendant which was given. We derived that vehicle to be that of his being in the area of the incident five minutes prior to the incident actually taking place. That way we didn't assume—and gathered information that listed him as a possible victim slash—I mean, as a witness slash defendant.

---

[15] At the post-conviction evidentiary hearing, counsel for the State basically laughed at Harris' Fourth Amendment issue and told him that he did not understand the law. (05/20/2010 Post-Conviction Hr'g Tr. 29-32, *Harris v. State,* No. 03-00441 (Shelby Cnty. Crim. Ct.), ECF No. 15-16.)

(Trial Tr. 12-13, *State v. Harris,* No. 03-00441, -00442 (Shelby Cnty. Crim. Ct.), ECF No. 15-4.) When the police found Harris, he was placed under arrest and brought to the homicide office for questioning. (*Id.*) Harris' point, then, is that there was no probable cause to arrest him when he was considered only a witness.

In *Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975), the Supreme Court held that "a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." Although the Fourth Amendment does not require a pre-arrest judicial determination of probable cause, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114; *see also id.* at 125 (states must "provide a fair and reliable determination of probable cause as a condition for any significant restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest") (footnotes omitted).

In *County of Riverside v. McLaughlin*, 500 U.S. 44, 53-54 (1991), the Supreme Court clarified that the Fourth Amendment does not require that the probable cause determination be made immediately after completion of the administrative steps incident to arrest, noting that "*Gerstein* held that probable cause determinations must be prompt — not immediate." Thus, the Supreme Court stated that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56. The Supreme Court further stated as follows:

> This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. **Examples of**

> **unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest**, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

*Id.* at 56-57 (emphasis added).

Harris relies on the Supreme Court's opinion in *Brown v. Illinois*, 422 U.S. 590, 592 (1975), in which police arrested the defendant and detained him for questioning despite having no information about him other than that he was acquainted with the murder victim. The suspect, who had been given the required *Miranda* warnings, confessed within two hours of his arrest. The Supreme Court held that the giving of *Miranda* warnings is insufficient to insulate a confession given after an illegal arrest from challenge. *Id.* at 603. The Supreme Court also declined to adopt an alternative *per se* rule that confessions that would not have been made without an illegal arrest must be suppressed. *Id.* Instead, the Supreme Court concluded that the determination of whether a confession is voluntary is highly fact-dependent:

> The question whether a confession is the product of a free will . . . must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Id.* at 603-04 (footnotes and citations omitted).

37

The Supreme Court declined to remand the case for further factual findings because the record was sufficient to determine that the confession should be suppressed. *Id.* at 604-05. The Court considered the facts that the prisoner confessed within two hours of his arrest and that the illegality appeared to be purposeful. The Court emphasized that "[t]he arrest, both in design and execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Id.* at 605. The manner of effecting the arrest, by lying in wait near the defendant's home, dressed in plain clothes, and accosting him with drawn weapons, was also problematic. The Supreme Court stated that "[t]he manner in which Brown's arrest was affected [sic] gives the appearance of having been calculated to cause surprise, fright, and confusion." *Id.* Nonetheless, the Supreme Court also emphasized that its "holding is a limited one. . . . We decide only that the Illinois courts were in error in assuming that the Miranda warnings, by themselves, under Wong Sun always purge the taint of an illegal arrest." *Id.*

Subsequently, in *Powell v. Nevada*, 511 U.S. 79, 84 (1994), the Supreme Court held that the rule in *McLaughlin* is retroactively applicable to cases that had not become final when the decision issued. Nonetheless, the Supreme Court noted that the appropriate remedy for a delay in determining probable cause is "an issue not resolved in *McLaughlin*." *Id.*

In *Kaupp v. Texas,* 538 U.S. 626 (2003) (per curiam), which was decided after Harris' arrest but two years before his trial, a nineteen-year-old confessed to the murder of his half-sister and implicated his seventeen-year-old friend in the crime. The police tried, unsuccessfully, to obtain a "pocket warrant," which would have authorized them to take Kaupp into custody for questioning. They did not seek a conventional arrest warrant because they did not believe they had probable cause to arrest him without corroborating evidence or a motive. *Id.* at 628 n.1. The

police were let into Kaupp's home by his father in the middle of the night, went into his bedroom, shined a flashlight in his face, and told him that "we need to go and talk." *Id.* at 628. Kaupp responded, "Okay." He was handcuffed and led, barefoot and dressed in a t-shirt and boxer shorts, to a patrol car. *Id.* On the way to the police station, the officers stopped for five or ten minutes at the place where the victim's body had been found. At the police station, Kaupp was taken to an interview room, his handcuffs were removed, and he was advised of his *Miranda* rights. He initially denied any involvement but, after ten or fifteen minutes of questioning, and after hearing of the brother's confession, he admitted to having some part in the crime. *Id.* at 628-29.

The Supreme Court held that Kaupp had been arrested without probable cause when the police took him from his home, despite his having said "okay," when awakened by the police. *Id.* at 630-32.[16] The Supreme Court addressed the remedy for a confession that is the fruit of an unlawful arrest:

> Since Kaupp was arrested before he was questioned, and because the State does not even claim that the sheriff's department had probable cause to detain him at that point, well-established precedent requires suppression of the confession unless that confession was "an act of free will [sufficient] to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State. *See Brown*, 422 U.S., at 604, 95 S. Ct. 2254. Relevant considerations include observance of *Miranda*, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." 422 U.S., at 603–604, 95 S. Ct. 2254 (footnotes and citation omitted).

---

[16] The Supreme Court also was not persuaded by the fact that "the sheriff's department 'routinely' transported individuals, including Kaupp on one prior occasion, while handcuffed for safety of the officers . . . ." *Id.* at 632.

The record before us shows that only one of these considerations, the giving of *Miranda* warnings, supports the State, and we held in *Brown* that "*Miranda* warnings, *alone* and *per se*, cannot always ... break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." 422 U.S., at 603, 95 S. Ct. 2254 (emphasis in original); *see also Taylor v. Alabama*, 457 U.S. 687, 699, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982) (O'CONNOR, J., dissenting) (noting that, although *Miranda* warnings are an important factor, "they are, standing alone, insufficient"). All other factors point the opposite way. There is no indication from the record that any substantial time passed between Kaupp's removal from his home in handcuffs and his confession after only 10 or 15 minutes of interrogation. In the interim, he remained in his partially clothed state in the physical custody of a number of officers, some of whom, at least, were conscious that they lacked probable cause to arrest. *See Brown*, *supra*, at 604-605, 95 S. Ct. 2254. In fact, the State has not even alleged "any meaningful intervening event" between the illegal arrest and Kaupp's confession. *Taylor*, *supra*, at 691, 102 S. Ct. 2664. Unless, on remand, the State can point to testimony undisclosed on the record before us, and weighty enough to carry the State's burden despite the clear force of the evidence shown here, the confession must be suppressed.

*Id.* at 632-33.

Harris' point, which he made repeatedly in state court, is that he was arrested in violation of

*Brown v. Illinois.* The Supreme Court's decision in *Kaupp v. Texas* also appears to provide

support for his position. At a minimum, Harris appears to have exhausted a claim that the

decision of the TCCA on his ineffective assistance of appellate counsel claim was contrary to, or

an unreasonable application of, *Smith v. Murray,* 477 U.S. 527, 535-36 (1986), which applies the

standards of *Strickland v. Washington* to a claim that counsel failed to raise a meritorious issue on

direct appeal. It also appears that Harris' trial counsel and, apparently, the state court judges who

presided over the trial, direct appeal, and post-conviction petition failed to realize that the Fourth

Amendment does not permit the police to arrest an individual who might be a witness to a crime

and hold him for 48 hours while the matter is investigated. It is unclear, however, whether Harris

properly exhausted an ineffective assistance of trial counsel claim based on counsel's failure

properly to litigate the Fourth Amendment issue. It is also unclear whether that failure can be

excused on the basis of the Supreme Court's decisions in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

Pursuant to 18 U.S.C. § 3006A(a)(2)(B), the Court is authorized to appoint counsel for indigent habeas petitioners when such appointment is in the interest of justice. The Court concludes that it is in the interest of justice to appoint counsel in this matter to represent Harris with respect to that portion of Claim 4 that addresses the handling by trial and appellate counsel of the Fourth Amendment issue arising from Harris' arrest. Therefore, the matter is REFERRED to Chief United States Magistrate Judge Diane K. Vescovo to determine whether Harris qualifies as an indigent habeas petitioner. Petitioner is ORDERED to file an *in forma pauperis* affidavit and a copy of his inmate trust fund account statement within twenty-eight days of the date of entry of this order.

IT IS SO ORDERED.


**s/ S. Thomas Anderson**
 S. THOMAS ANDERSON
 UNITED STATES DISTRICT JUDGE

 Date: September 22, 2015.